Nott, J.,
delivered the opinion of the court:
These cases bring before the court the right of the Army and Navy, including officers, soldiers, and seamen, to the “ three months’ extra pay” given by the Act 19th July, 1848 (9 Stat. L., p, 248, § 5). Considered by themselves the cases are trivial in amount and unimportant in effect. Considered as representative of the rights of thousands who participated in the war with Mexico, and of their surviving relatives, the cases may be deemed of very great magnitude.
What the total number of persons engaged in the war was it is impossible to state with absolute precision; but the Secretary of War, in a communication to the House of Representatives, dated January 5, 1849, reports “the number of regular troops engaged in said war ” to have been 43,393; and the Sec *258 retary of the Navy, in a similar communication of the same date, states the force of the Navy so engaged at 9,308. Thus it ap-ireara that the aggregated numbers of the regular Army and Navy engaged in the Mexican war must have exceeded 52,000 persons; and of them the present cases represent the rights of several thousand officers.
The court, therefore, has given to these cases serious consideration, yet has not reached its conclusion without being affected by doubts which attach to certain questions of statutory construction.
Five years have now elapsed since the amendatory Act 19th February, 1879 (20 Stat. L., p. 316), declared “ that the provisions of this act shall include also the officers, petty officers, seamen, and marines of the United States Navy, the Revenue-Marine Service, and the officers and soldiers of the United States Army employed in the prosecution of said war.” Nevertheless, as the court is informed, and we have no doubt correctly, uot one officer named in this provision, either of the Army or Navy, has received the benefits of the statute. The practical result to every one of them has been precisely the same as if this statute had never been enacted. Yet this result is not to be ascribed to an intent on the part of the Treasury to evade the legislative will, but on the contrary to certain statutory incongruities, apparently so irreconcilable as to be beyond the proper duties of the accounting officers, and to require the offices of judicial interpretation.
In order that we may deal with these difficulties intelligently, it is necessary that the history of this legislation be reviewed.
The treaty of Guadalupe-Hidalgo was signed on the 2d of February, 1848. The war with Mexico had been proescuted largely by volunteer regiments enlisted specially for that service. Their military employment was not one in which even a thrifty person could lay up money, and Congress was brought face to face with the fact that these men were about to be thrown on their own resources and would soon be compelled to seek new livelihoods in civil life. The national gratitude forbade that they should be cast out of the Army penniless, and took effective form in the Act 19th July, 1848 (9 Stat. L., § 5, p. 248, ch. 29).
The statute was intended for those who having left civil life to engage in the war were about to return to civil life. Hence it included only “the officers, non-commissioned officers, musi *259 cians, and privates engaged in the military service of the United States in the war with Mexico.” It was primarily for the benefit of those “who served out the term of their engagement,” but there were others who had been, or might thereafter be, prevented from so doing by misfortunes or mishaps beyond their own control. Hence it included those “ who have been or may be honorably discharged.” Moreover, there were others who had made a still greater sacrifice, and the national gratitude would not permit a seeming discrimination against the dead. Hence the statute provided that its benefits should extend “ first, to the widows; second, to the children; third, to the. parents; and fourth, to the brothers and sisters of such who have been killed in battle or who died in the service.” Finally, there were those who might die after leaviug the service, but before receiving the three months’ extra pay, and as to them no one wished that this legacy should lapse. Hence the statute expressly included those who “ have since died, or may hereafter die, without receiving the three months’ pay herein provided for.” A general limitation was then added restricting the benefits of the statute to those wdio had been “ ip actual service during the war,” and all of these provisions were embodied in the following form : ■
. “ Seo. 5. That the officers, non-commissioned officers, musicians, and privates engaged in the military service of the United States in the war with Mexico, and who served out the term of their engagement, or have been or may be honorably discharged — and first to the widows, second to the children, third to the parents, and fourth to the brothers and sisters of such who have been killed in battle, or who died in the service, or who, having been honorably discharged, have since died, or may here,ifter die, without receiving the three months’ pay herein provided for — shall be entitled to receive three months’ extra pay: Provided, That this provision of this fifth section shall only apply to those who have been in actual service during the war. (9 Stat. L., § 5, 248, ch. 29.)
On the 3d August, 1848, the act was interpreted by an able statesman, who had been an eminent judge, Mr. Secretary Marcy. • As this document is of much importance in the consideration of these cases, and is not easily procured, we insert it in extenso :
“War Department,
“ Washington, August 3,1848.
“ Sir : In reply to your interrogatories in relation to the construction to be given to the fifth section of the act to amend an act entitled ‘An act supplemental to an act entitled “An act *260 providing for the prosecution of the existing war between the United States and the Republic of Mexico, and for other purposes,” ’ passed the 19th ultimo, I present the following as my views on the subject:
“ The proviso restricts the benefit of the section to those who have been in ‘ actual service.’ Something more than a mere muster into service is undoubtedly required. Recruits whohad not left the United States for the seat of war, or if they had left it, but had not joined their respective companies, are not entitled to the extra pay allowed by the fifth section of the act above referred to.
“Volunteers, although mustered into service, if they were not marched or sent to the seat of vrar, or to positions where service was required of them, cannot be said to have been in actual service, and do not, therefore, come within the provisions of the law for extra pay. This view of the law will exclude from extra pay the troops which were called out by General Gaines, and discharged before being sent to Mexico or Texas; the troops organized under the call of Colonel Curtis, and discharged before they went to Mexico or were not put on duty there, and the regiment of,volunteers called for from Missouri in 1846 for Santa Fé, and discharged before beiug sent to that destina-tion.
“If an officer, non-commissioned officer, private, &c., after muster into service has been discharged by reason of ill health incurred while in the service of the United States, he is entitled to the three months’ extra pay. But where he has been discharged on his own application on any grounds which did not render him incapable of serving out the term of his engagement, he is not entitled to the benefit of the law, although an honorable discharge may have been given to him. When a volunteer officer wishing to retire from the service of the United States has tendered the resignation of his commission, and it was not accepted in the form of a resignation, but he was discharged, he is not entitled to extra pay. Officers appointed by the President leave the service by the tender and acceptance of their resignation. Those receiving appointments from the executive of the States, and received into the service of the United States, retire from it by discharge; the former are not entitled to extra pay, nor can it be the intention of the law to allow it to the latter where they were discharged before the term of their service had expired, on their own application.
“ I am of opinion that, in all cases where officers, non-commissioned officers, privates, &c., were actually mustered into service, and while en route to the seat of war or the place assigned for actual service have died or have been discharged in consequence of sickness incurred since being received into service, the right to extra pay attaches.
“ W. L. Marcy,

‘Secretary of War

“Lieut. Col. B. F. Larned,
u Acting Pay master-General.”
*261 For thirty years this exposition of Secretary Marcy guided the War and Treasury Departments in administering the statute, undisturbed by legislation and unquestioned by judicial decisions. Moreover, in 1870, the Supreme Court, when construing a similar statute, gave to it, the Act 3d March, 1865 (13 Stat. L., p. 497, sec. 4), precisely the same effect which the executive branch of the government had so long given to the Act 19th July, 1848, Merrill’s Case (9 Wall. R., 614). Practically the exposition of the Secretary stood in the stead of the statute, and from 1848 to 1879 was treated as the law of the land. In the latter year was passed the Act 19th February, 1879 (20 Stat. L., p. 316, ch. 90), which is in these words:
“AN ACT for tile payment, to the officers and soldiers of the Mexican war, of the three months’ extra pay provided for by the act of July nineteenth, eighteen hundred and forty-eight.
“Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, directed, out of any moneys in the Treasury not otherwise appropriated, to pay to the officers and soldiers ‘ engaged in the military service of the United States in the war with Mexico, and who served out the time of their engagement or were honorably discharged,’ the three months’ extra pay provided for by the act of July nineteenth, eighteen hundred and forty-eight, and the limitations contained in said act, in all cases, upon the presentation of satisfactory evidence that said extra compensation has not been previously received: Provided, That the provisions of this act shall include also the officers, petty-officers, seamen, and marines of the United States Navy, the Bevenue Marine Service, and the officers and soldiers of the United States Army employed in the prosecution of said war.
“Approved Feb. 19, 1879.”
When the accounting officers came to administer this statute they found that by the terms of its proviso, its provisions, or more properly the provisions of the Act 1848, were extended to those officers and men of the Army and Navy who had been engaged in the Mexican war. But they also found that the three months’ extra pay given by the Act 1848 was granted upon certain conditions: upon condition that the beneficiaries had been “engaged in the military service of the United States in the war with Mexico;” upon condition that they had “served out the term of their engagement,” or had been “ honorably discharged;” upon condition, according to the long-accepted *262 exposition of Secretary Marcy, that they had enlisted for the prosecution of the Mexican war, and at its close had returned to civil life. Taking the two statutes together the accounting officers found that the one professed to confer a benefit upon the officers of the Army and Navy, but that the other coupled with it certain impossible conditions.
Here it may be as well to inquire as to the signification of certain military terms, and of some of the terms used in these statutes.
The terms “muster in” and “muster out” are applicable properly to bodies of men, i. e., where the organization was effected before they were taken into the service of the government. But; these terms are not applied to officers or men in the regular military organizations of the government. The State militia and the volunteer regiments during the civil war were mustered into the service of the United States; but the officers and men of the Army and Navy were neither mustered into nor out of the service. The term “discharged is a term applied to individuals, and not to organizations. It is also limited in its application to those who have enlisted for definite periods. Hencein the Regular Army it is .applicable only to non-commissioned officers, privates, musicians, &c., who have enlisted for definite periods, and not to officers who are appointed for life, or during the pleasure of the President. For officers leaving the Army or Navy there is no term analogous to discharge; if they leave the service honorably they leave by resignation or retirement; if they leave dishonorably they are dismissed or cashiered.
As to certain terms employed in the statutes under consideration, we observe that the Act 1848 speaks of officers and, &c., “ engaged” “ in the war with Mexico and who served out the term of their engagement.” We apprehend that this term was used much in the sense of enlistment. If the statute had referred to non-commissioned officers and privates, i. e., to enlisted men, we have no doubt that it would have said, “ who served out the term of their enlistment.” But the term “ enlist” is not applicable to officers. “Officers and enlisted men” constitute the two military classes which make up the Army. Therefore the statute used a non-technieal word, which should embrace both.
*263 Other instances can be found in the statute-books where the legislative draftsman has been embarrassed by the technical meanings which the Army attaches to these words. Thus the Act 3d August, 1861 (12 Stat. L., p. 289, § 17), provided a method for dealing the Army of officers incapacitated for service. As to those who were incapacitated from long and faithful service, by wounds, &c., it provided that they should be placed on the retired list.. As to those whose incapacity, was not the direct result of their service the statute intended that they should be removed from office with one year’s pay. But the draftsman manifestly could not find a term or phrase to express that idea. If the statute should say “ discharged” it would use a term applicable to enlisted men; if it should say “ dismissed” it would use a. term savoring of punishment and disgrace. He therefore avoided these and used the curious euphemism “ wholly retired.”
The Act 1848 also uses the term “ discharged.” But it is manifest that it is not used in its technical sense, but in antithesis to “ engaged.” The one word referred to the processes by which volunteers, officers, and men got into the service of the government during the war with Mexico; the other to the processes by which they got out of the service. The latter processes were limited by one of two conditions: either they must have served through “the term of their engagement” or, if they left the service sooner, their leaving must have had an honorable cause.
In the Act 1879 the word “time” is substituted for “term;” it reads the “time of their engagement.” On the argument much stress was laid on this change; but as the language of the one statute is a literal quotation from the other, and is moreover placed in quotation marks, we are of the opinion that the substitution of “time” for “term” was a clerical error, or that the one word is to be taken as synonymous with the other.
But it is manifest that an elucidation of these terms does not tend to reconcile the two statutes. Indeed, on the contrary, it only renders their incongruities more apparent.
We find also that the legislative history of the Act 1879 sheds no real light upon the actual design of Congress. On 17th January, 1878, the original bill, without the final provision relating to the Army, Navy, and the Revenue Marine Service, was considered and passed by the House of Representatives. *264 It was not brought before the House by the report of a committee, but the member having it in charge stated to the House that it related to only about one hundred and fifty persons “ who had never called for their three months’ paythat it involved only about $40,000, and that the only reason for passing it was to be fouudin thefactthat the original appropriation had lapsed. In other words, the House was assured that the bill conferred no new rights, and the assurance accorded with the bill as it then stood. (Cong. Record, vol. 7, part 1, p. 386.)
In the Senate the bill was accompanied by the written report of the Committee on Military Affairs. The report recommended the passage of the bill, with an amendment in favor of theNavy. On the motion of the member of the committee having the bill in charge, the Army was added to the amendment, and, on the motion of another Senator the Revenue Marine Service. The persistent questioning of a third Senator gradually brought out the fact that the Act 1848 did not embrace the Army and Navy, and the Senator who last spoke in the debate characterized the amendment as u an act for equalization — an act to pay regular soldiers what was paid to volunteer soldiers.” (Cong. Record, vol. 8, part 1, pp. 451, 1120.) When the bill, as thus amended, went back to the House it was not referred to a committee; it was not debated; but was sirflply taken from the Speaker’s table by unanimous consent, the amendment read, and the bill passed. (Cong. Record, vol. 8, part 2, p. 1316.) We are' therefore compelled to interpret the statute with no other light than can be gathered from its own terms, and the question really is whether it shall be construed to extend the benefits of the Act 1848 to those officers of the Army, Navy,, and Revenue Marine who served in the Mexican war, or whether it shall have no effect whatever.
The latter alternative cannot be adopted by the judiciary if it can possibly be avoided. The former act, of which this has become to all intents and purposes a part, may contain incongruous terms and provisions and still effect may be given to the latter. -Many members of the two houses of Congress manifestly were ignorant of the fact that the Act 1848 was restricted by long-settled construction to the volunteer officers,, and many did not perceive that it contained conditions inapplicable to the Army and Navy, and many more doubtless supposed that the Act 1879, even as amended, was merely providing an *265 appropriation for a few persons entitled to payment under the Act 1848 ; and yet it is incontrovertible that the language of the Act 1879 plainly confers a benefit upon the Army, Navy, ánd Revenue Marine Service; that it is susceptible of no other meaning; and that the obscurities which have embarrassed the accounting officers lie entirely behind it and spring out of the indirect and somewhat obscure phraseology of the earlier statute, which restricted the three months’ pay to the volunteer forces, without saying so in plain English.
The construction which this court now gives to the two statutes read in pari materia is this: Those conditions in the Act 1848 which in effect defined it to be an act properly applicable to the volunteer forces are to be restricted to them, and are not to be used to defeat the rights created by the Act 1879. At the same time the limitations of-the earlier statute are to be applied to the Army, Navy, and Revenue Marine so far as they can be applied without defeating the purposes of the Act 1879. Thus, an officer or soldier must have been uin actual service during the war.” Thus, an enlisted man must have served out “ the term, of his engagement,” whatever it was, or must have been “ honorably discharged.” Thus, an officer must have served until the end of the war, or must have left the service for a cause which rendered him incapable of serving. The decision of this court in Donnan’s Case (15 C. Cls. R., p. 382), where it was held that an officer who resigned without such cause was not “honorably discharged” within the true intent of the statute, will be as applicable to an officer of the Regular Army as to an officer of volunteers; the letter of Secretary Marcy will need little other modification than the omission of that portion which restricts the operation of the Act 1848 to officers of volunteers ; and those phrases in it being changed, which ought to be changed, mutatis mutandis, it will continue to be an exposition applicable to the new law as well as the old.
We come now to the question of pay, or rather to a series of questions each of which is more doubtful and more obscure than the one that has been considered.
The Act 1879 makes no distinction between the “ three months’ extra pay” of officers in the Army and Navy, although the methods by which their compensation was computed in 1848 were widely different, and must lead to widely different results *266 now; for the Act 1879 does not give “three months’ extra pay” at present rates, but merely extends to “ officers, petty officers, seamen, and marines of” the Navy and Revenue Marine, uthe three months’ extra pay provided for by the Act of July 19, 1848.”
A number of questions here arise as to what shall be deemed the “extra pay provided for by the Act of July 19, 1848.” Does “pay” mean simply that part of military compensation generally termed “pay,” and sometimes “pay proper,” or does it mean the entire compensation known as “pay and allowances” f Are the naval officers to recover three months of Army payor of Navy pay? For “the three months’ extra pay provided for by the Act of July 19,1848,” certainly was not Navy pay, and, as was said on the argument by one of the counsel, if simply pay proper is recoverable by Army officers, a commander in the Navy will recover a larger amount under the statute than the heirs of General Scott. If Navy pay is to be recovered, then what kind of Navy pay? For under the Act to regulate the pay of the Navy of the United States, 3 March, 1835 (4 Stat. L., p. 775), there were different kinds. There was “ sea-service” pay, “other-duty ” pay, “ off-duty” pay. A commander attached to a vessel for sea service received $2,500; attached to a navy-yard, $2,100; on leave of absence or waiting orders, $1,800. A lieutenant, if “commanding,” received $1,800; if on “other duty,” $1,500; if “ waiting orders,” $1,200.
Again, at what point of time in the period of service shall the three months’ extra pay be ascertained? The act of 1848 did not prescribe a time, for it was dealing only with the volunteer officers. When an officer of volunteers was mustered out at the end of the war his rank then fixed the rate at which he was to be paid. If he were mustered out as a colonel he received the pay of a colonel, and the same paymaster who paid him the last installment of .his regular pay in all probability likewise paid him his three months’ extra pay. In other words, such an officer was deemed to be serving in the war with Mexico until he was formally released from service and restored to civil life by his muster out or honorable discharge. But in the case of an Army or Navy officer he can produce no such formal evidence fixing the period when he ceased to serve in the prosecution of that particular war. The treaty of Guadalupe-Hidalgo was signed on the 2d day of February, 1848; the ratifications were exchanged on the 30th of May; the statute giving the ex *267 tra pay was passed on the 19th July. Au Army officer might have been a lieutenant on the day the treaty was signed, a captain when the ratifications were exchanged, a major when the act was passed. According to which rank shall he be paid the three months’ extra pay 1 Or, conversely, a lieutenant in the Navy might have been “commanding” when the treaty was signed, on “other duty” when the ratifications were exchanged, and “ waiting orders ” when the act was passed. In these eases the same rule would work in two different ways, giving to the one the highest and to the other the lowest amount possible.
It is the purpose of the court, in ans wering these questions, to answer them in such a way that the judicial construction of the statute shall afford to the accounting officers of the Treasury some practical guidance in the adjustment of the great mass and variety of claims which will probably be brought before them soon. Where a statute leaves much uncertain it is inevitable that doubts will attend its construction, and we are aware that different minds in the present instance would solve these doubts in different ways. Our purpose has been so to construe the statute as to give practical effect to the legislative will, and at the same time unite with this construction.the plainest and simplest directions which may aid the executive officers in their labor of administering the law.
1. As to the question whether the term “pay” when applied to Army officers means pay and allowances or pay proper. In Major Sherburne's Case (16 C. Cls. R., p. 491) we had occasion to examine the import of these terms, and there said (p. 406):
“Pay is a fixed and direct amount given by law to persons in ■the military service, in consideration of and as compensation for their personal service.
“Allowances, as they are now called, or emoluments, as they were formerly termed, are indirect or contingent remuneration, which may or may not be earned, and, which is sometimes in the nature of compensation, and sometimes in the nature of reimbursement. Both pay and allowances are compensation for services while in service, and the system of making a portion of the compensation contingent was, at the time of the passage of the act, 1870, common to all armies. (Scott’s Military Dictionary, art. ‘Allowances.’)
“ Thus a captain of cavalry formerly received $70 per month, which was his pay, and was fixed, direct, and certain. He also received $10 a month if in the actual command of his company. He also was entitled to commutation for the forage of two *268 horses, if he actually had them in service. He also was entitled to rations for himself aud servants, and to longevity rations after certain prolonged periods of service; to fuel, to quarters, to transportation, to mileage, and to stationery, These were allowances. Some of them, considered as comimn-sation, were indirect, and some contingent; but in all instances they were something given for service, or as reimbursement.”
At the present time these allowances to Army officers for the most part have been abolished, and the pay proper correspondingly increased; but in order that it may be seen what an involved and intricate thing an officer’s pay account was in 1848, we state an illustrative case:
General Scott’s pay, according to the schedule given in the Army Regulations 1841, in force during the Mexican war, was only $2,400 a year, but his allowances brought it up to more than $4,800, and his monthly pay account, apart from longevity rations, would have been stated as follows:
Pay.......................................... $200 00
For 15 rations, at 20 cents................. 90 00
For forage for 7 horses......................... 56 00
For 4 servants, at $7 per month................... 28 00
For 4 servants’ rations.......................... 24 00
For 4 servants’ clothing.......................... 10 00
Total per month............................ 408 00
While General Scott’s pay was $2,400 a year, the pay of a naval commander was $2,500; of a captain, $4,000; and of the senior captain in the Navy, $4,500. Thus the different methods of stating compensation in the Army and Navy would have given to General Scott, for his three months’ extra pay, less than half the amount which would have been given to the highest officer in the Navy.
Nevertheless, we are of the opinion that the three months’ extra pay of Army officers cannot be held to include allowances.
In the first place, as was said in Sherburne’s case, “ since the reduction of the Continental Army, under the White Plains arrangement, 1778, to the present time, extra pay, in the form of half pay for life, of five years’ full pay, of three months’ additional pay, of one year’s additional pay, of pay and allowances, of bounty and land warrants, has been allowed, almost without exception, to officers and soldiers discharged without fault of their own when their services were no longer needed; ” and in no^ *269 case which lias been brought to our notice has the term “pay” been deemed, either by Congress, or by the accounting officers, or by the courts, to include allowances. In the second place, Congress, when treating with unprecedented liberality the armies of the civil war, expressly restricted their three months’ extra pay by the Act 3d March, 1865 (13 Stat. L., p. 497), to “pay proper.” The different phraseology of different statutes does not give occasion for the application of the maxim expressio unius exclusio alterius, and the fact that Congress then, from motives of caution, used the unmistakable term “ pay proper,” indicates very clearly what the legislative view of this question has been. In the third place, the word “ pay,” in the act of 1848, for more than thirty-five years has been held to mean pay proper, and nothing more. Congress have not changed that construction, the courts have adopted it, the volunteer officers, for whose benefit the act was passed, have been paid according to it, and it is impossible, at this late day, to undo what has been done, or to say that the officers of the regular Army shall receive twice as much as the officers of the volunteer forces did.
2. As to the kind of pay which naval officers shall recover we are of the opinion that it is navy pay. It is true that the act of 1879 gives to naval officers the benefits of the act of 1848, and that the act of 1848 gives to its beneficiaries nothing but Army pay, yet, nevertheless, the manifest purpose of the later statute is to give to every officer three months’ extra pay of the kind which he was lawfully entitled to receive when his service in the war with Mexico ended. Moreover, it would be iiiqmssible for either courts or accounting officers to fix the relative value of rank in the Army and Navy. There were major-generals in the Army, but officers of no higher rank than captain in the Navy. There were also officers in the Navy as to whom no corresponding rank could be assigned in the Army, such as warranted masters’ mates, passed midshipmen, second masters, sailing masters, secretaries. The confusion, too, would be greatly increased when we came to the petty officers of the Navy, for what Ármy pay could be assigned to boatswains, gunners, sailmakers, carpenters?
3. If navy pay is to be recovered then what kind of navy pay, “sea-service pay,” “other-duty pay,” “off-duty pay,” “leave-of-absence or waiting-orders pay,” &c. ? As to this question *270 we are of the opinion that the principle must be applied to the officers and petty officers of the Navy which always has been applied to the officers and non-commissioned officers of the volunteer service. An officer served during the war in various ranks — as captain, major, colonel; he may also have been promoted only a month before his service ended; nevertheless the extra pay which was paid to him was extra to that which he was receiving, or entitled to receive, at the time of his muster out. The court has no power to legislate as to what grade of pay naval officers shall now receive. It cannot decree that an officer waiting orders shall recover sea-service pay, or that an officer on sea service shall recover waiting-orders pay. But, inasmuch as Congress went to the act of 1848 when enacting that naval officers shall receive three months’ extra pay, the court may go there for a like purpose and carry out the analogy which the act of 1879 instituted. We therefore hold that the pay which a naval officer was receiving when his service in the war with Mexico ended furnishes the standard by which his three months’ extra pay must be computed. If he was then on sea service it will be sea-service pay; if he was on other duty it will be other-duty pay; if he was on waiting orders it will be waiting-orders pay; if he was a lieutenant commanding it will be a lieutenant’s pay when commanding; if he was a lieutenant on other duty it will be simply a lieutenant’s pay.
4. As to the point of time in the period of an Army or Navy officer’s service which shall be taken as equivalent to the muster-out of the volunteers — the time at which his rank must be ascertained and extra pay must be computed, we are of the opinion that it should be the time when his “ actual service during the war ” ceased. In the case of volunteer officers that time was definitely fixed by the event of their muster-out. They served in the war with Mexico, not till the signing of the treaty; not till the exchange of ratifications; not till the passage of the act giving them three months’ extra pay, but until they had “served out the term of their engagements,” as evidenced by their muster-out. In the case of officers in the Army and Navy who were never mustered out the accounting officers will have no such formal and certain test to apply. But this court cannot legislate into the act a fixed day up to which promotions shall be recognized and after which promotions shall *271 be valueless. It can only go back to tbe analogy before mentioned and apply the statute, mutatis mutandis, to the officers of the Army and Navy, as nearly as may be possible, in the manner in which it always has been applied to the officers of volunteers. The record of every officer to be found in the War and Navy Departments will show when his “.actual service during the war” with Mexico ceased, and the rank which he then held is the rank by. which his pay must be computed, under these statutes. If an officer died while so serving, his death fixes the tiine when his service ceased. If an officer resigned for good cause, the acceptance of his resignation fixes the time. If an officer was withdrawn from “actual service” and assigned to other duty, the order assigning him fixes the time. If an officer continued to serve against Mexico until his regiment, or battery, or ship, was withdrawn from the “ actual service” of prosecuting the war, the order recalling his command, or vessel, fixes the time. In a word, when these officers’ “ actual service in the war” ceased, they must be-deemed to have then “served out the term of their engagement,” and to have then fixed the rank according to which their three months’ extra pay must be computed; and if no other event occurred, the exchange of ratifications on the 30th May, 1848, terminated the war with Mexico, and necessarily brought to a close the “ actual service” of every officer.
In the case of Lieutenant-Colonel Emory, the judgment of the court is that he recover three months’ extra pay as a lieutenant-colonel of volunteers at the time of his muster-out as such, on the 24th July, 1848, amounting to the sum of $180.
In the case of Lieutenant North, the judgment of the court is that he recover three months’ extra, sea-service pay as a lieutenant attached to a vessel for sea service, amounting to the sum of $375.